IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAIT TOWERS | : | |
| MANUFACTURING, LLC | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO. 24-1720 |
| | : | |
| WICREATIONS, BVBA, et al. | : | |
| | : | |

MEMORANDUM OPINION

**Henry, J.**                                                                                                **June 18, 2026**

Pending before the Court is Plaintiff TAIT TOWERS MANUFACTURING, LLC's and

Defendants WICREATIONS, BVBA and Hans Willems's request for the Court to construe twelve

claims at issue in this patent infringement suit.

In this case, Plaintiff alleges that Defendants infringed upon four of its patents: U.S. Patent

No. 7,703,401 B2, entitled "Portable Locking Support Structure" (the "'401 Patent"), *see* ECF No.

47-1; No. 7,922,416 B2, entitled "Portable Locking Support Structure" (the "'416 Patent"), *see*

ECF No. 47-2; No. 8,793,876 B2, entitled "Method of Assembling a Portable Support Structure"

(the "'876 Patent"), *see* ECF No. 47-3; and No. D675,343, entitled "Support Structure" (the "'343

Patent"), *see* ECF No. 47-4 (collectively, "the Patents-in-Suit"). The Patents-in-Suit relate to a

"staging system which uses interlocking decks to create a monolithic performing surface while

minimizing setup/strike time and labor." *See* ECF No. 47 at ¶ 8. Plaintiff alleges that Defendants

developed a competing staging system called "WIDECK" or "WISTAGE," which infringes on

certain elements of the Patents-in-Suit. *Id.* at ¶¶ 9-10. WICREATIONS denies Plaintiff's

allegations, asserting affirmative defenses of invalidity for failure to comply with patentability

requirements, noninfringement, and prosecution history estoppel, among others. *See generally*

1

ECF No. 50 ("Ans."). Mr. Willems challenges this Court's personal jurisdiction over him in a pending motion to dismiss. *See* ECF No. 57.

The parties now ask the Court to construe twelve disputed claims, with their respective arguments set forth in a Joint Claim Construction Brief. *See* ECF No. 78 ("Brief"). The Court held a claim construction hearing on March 17, 2026.

## I.    LEGAL STANDARD

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A claim's words "are generally given their ordinary and customary meaning"—that is, "the meaning that the term would have to a person of ordinary skill in the art [a 'POSITA'] in question at the time of the invention." *Id.* at 1312-13 (internal citations omitted).

In some circumstances, "the ordinary meaning of claim language as understood by a [POSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. But "[i]f the meaning isn't readily apparent, 'the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history.'" *LoganTree LP v. Fossil Grp., Inc.*, No. 21-cv-00385, 2024 WL 1406539, at *2 (D. Del. Apr. 2, 2024) (quoting *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001)).

The Court should first consider "the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Indeed, claims

2

should be "interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). "Readings that render claim language 'superfluous' or 'meaningless' are disfavored." *LoganTree LP*, 2024 WL 1406539, at *2.

The Court should also be aware that in some cases, a patentee may act as his own lexicographer and use terms in a manner other than their plain and ordinary meaning, which is permitted "as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics Corp.*, 90 F.3d at 1582.

Next, the Court looks to the specification "to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Id.* The specification, which is "highly relevant" to claim construction, "contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it." *Id.* The specification is usually dispositive. *Id.*

Additionally, the Court may also consider the patent's prosecution history. The prosecution history "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims." *Id.* "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

Courts may also look to extrinsic evidence such as dictionaries and treatises if the claim requires further construction, although extrinsic evidence is generally "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1318.

3

## II.   CONSTRUCTION OF DISPUTED TERMS

### A.  A Flared End[1]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
| --- | --- | --- |
| the part of the terminal portion of the connector that spreads outward | an end that spreads outward to a terminal surface | an end that spreads outward |

Plaintiff proposes construing the term "a flared end" as "the part of the terminal portion of the connector that spreads outward." Brief at 21. Looking to the language of Claim 1 of the '401 Patent, Plaintiff submits that the "flared end" is the "end of the first end"—that is, the end of the elongate primary support containing the male primary connector with specific components. *Id.* This, Plaintiff says, is the plain and ordinary meaning of the term "flared end"—part of the larger "first end" or "terminal portion." *Id.*

Defendants dispute this interpretation, primarily because there is no reference to a "terminal portion" in any of the claims or specifications of the Patents-in-Suit, a term which Defendants assert is "intentionally vague" and "introduced in an attempt to broaden the location of the flared portion." *Id.* at 23. Indeed, at the claim construction hearing, Defendants argued that Plaintiff's construction, as proposed, would allow the flared end to be relocated to a number of

---

[1] This term appears in Claims 1 and 12 of the '401 Patent and Claim 1 of the '416 Patent.

The relevant language of Claim 1 of the '401 Patent is: "A portable support structure comprising: an elongate primary support configured to vertically support a platform, the elongate primary support comprising: a first end comprising a male primary connector having a flange portion, **a flared end**, and a tapered portion disposed between the flange portion and **the flared end**, **the flared end** having an alignment channel across an end surface." ECF No. 47-1 (the "'401 Patent") at 14:9-17 (emphasis added).

Claim 1 of the '416 Patent contains materially similar language with respect to the flared end: "A connector system for connecting components of a support structure in proper orientation, the connector system comprising: a male support connector having a flange portion, **a flared end**, and a tapered portion disposed between the flange portion and **the flared end**, **the flared end** having an alignment channel cross an end surface." ECF No. 47-2 (the "'416 Patent") at 14:28-34 (emphasis added).

different locations within the male primary connector that would be inconsistent with the context of the claim.

Defendants' proposal, on the other hand, is to construe the term "a flared end" as "an end that spreads outward to a terminal surface," contending this construction is consistent with the claim language, specification, and prosecution history. *Id.* at 22. The claim language, they say, mandates that the flared portion of the male primary connector is the *end* of the male primary connector and is "not just any element of the male primary connector that spreads outward." *Id.* at 23. Pointing to the prosecution history, Defendants argue that during prosecution of the '401 patent, Plaintiff indicated that the "flared end" was "alignment member 505" and included "an alignment channel 1105 ***across an end surface***," which would make the flared end "necessarily the terminal portion of the male primary connector, which extends to a terminal surface." *Id.* (emphasis in Brief). In other words, "[a] flared end that has an alignment channel 'across an end surface' must definitionally have an end, or terminal, surface for the alignment channel." *Id.* at 24.

Plaintiff takes issue with Defendant's interpretation because the requirement that the flared end "spread outward to a terminal surface" has no basis in the plain and ordinary meaning of the term "flared end," and because the proposed limitation would exclude the preferred embodiment, which depicts a flared end that first spreads outward, but then curves inward before reaching a flat surface.  *Id.* at 21-22.  Plaintiff also believes that Defendants' construction would complicate a jury's understanding that "the flared end is only one part of the larger first end." *Id.* at 22.

I will construe "a flared end" as "an end that spreads outward." At the claim construction hearing, counsel for Plaintiff conceded that the word "terminal portion" could just be replaced with "end," eliminating the issue of the novel usage of the term "terminal portion." I do not find persuasive Defendants' argument that since the claim requires the flared end to have an alignment channel across an end surface, then the flared end necessarily must be defined as having an end

surface. Such definition is not necessary and would make the greater claim language redundant—the language "the flared end having an alignment channel across an end surface" supplies the requirement that the flared end has an end surface without requiring the construction of "flared end" to include some reference to an end surface. And Defendants' concern that Plaintiff's definition allows the "flared end" to be located anywhere on the terminal portion of the elongate support is similarly unpersuasive: Since the claim language supplies that the male primary connector has a flared end with an *end surface*, the flared end must necessarily be at the end of the male primary connector. The plain language is clear, and no further construction is required beyond the fact that the flared end is an end that spreads outward.

### B. A Tapered Portion[2]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| the progressively narrowed part of the terminal portion | a portion having a continuously reducing outer area | a gradually narrowed portion |

Plaintiff proposes construing the phrase "a tapered portion" as "the progressively narrowed part of the terminal portion," contending that that construction is based on the plain and ordinary meaning of the term. Brief at 25. It points to the Merriam-Webster dictionary definition of "taper" as "progressively narrowed toward one end." *Id.* Defendants oppose Plaintiff's use of the phrase "terminal portion," which they argue would allow the "tapered portion" to be located at any portion

---

[2] This term appears in Claims 1 and 12 of the '401 Patent and Claim 1 of the '416 Patent.

The relevant language of Claim 1 of the '401 Patent is: "A portable support structure comprising: an elongate primary support configured to vertically support a platform, the  elongate primary support comprising: a first end comprising a male primary connector having a flange portion, a flared end, and **a tapered portion** disposed between the flange portion and the flared end, the flared end having an alignment channel across an end surface." '401 Patent at 14:9-17 (emphasis added).

Claim 1 of the '416 Patent contains materially similar language. *See* '416 Patent at 14:28-34.

of the primary support—a construction which Defendants believe is self-serving for Plaintiff. *Id.* at 26.

Defendants instead propose construing "a tapered portion" as "a portion having a continuously reducing outer area." *Id.* at 25. They point to the specifications of the '401 Patent, which provide that "the tapered portion 'preferably has a frusto-conical shape' that, in conjunction with a primary platform connector, 'distribute[s] the force from the platform member' and maintains engagement," *id.* (quoting '401 Patent, 6:4-12), as well as Figure 11 of the '401 Patent, in which "the tapered portion . . . *continuously* reduces from a first diameter adjacent to the flange . . . to a second diameter adjacent to the flared end," *id.* (emphasis in original). Defendants also rely on Webster's II New College Dictionary from 2001, the time of the invention, which defines "taper" as "to become gradually thinner or narrower toward one end," arguing that "[a] POSITA would have understood that becoming gradually thinner or narrower would result in a continuous reduction in outer area." *Id.* at 26.

Plaintiff challenges Defendants' use of the word "continuously," which it asserts is a "novel limitation" that does not appear in any dictionary definition of "taper" and is not otherwise supported by the Patents-in-Suit. *Id.* at 25. It also challenges Defendants' reliance on Figure 11 of the '401 Patent, arguing that it is merely an embodiment of the patent and that Defendants "make no attempt to explain how . . . [the figure] amounts to a 'manifest exclusion or restriction' of portions without a 'continuously reducing outer area.'" *Id.* at 4.

First, I do not find Plaintiff's proposed inclusion of the phrase "of the terminal portion" necessary, as the claim language already makes clear that the tapered portion is part of the end portion. *See* '401 Patent, 14:13-17 ("[A] **first end comprising a male primary connector** having a flange portion, a flared end, and **a tapered portion** disposed between the flange portion and the flared end, the flared end having an alignment channel across an end surface.") (emphasis added).

7

The remaining issue in construing this claim is whether tapered means "progressively narrowed," "continuously reducing," or something else. I decline to adopt Defendants' position that the tapered portion must reduce at a continuous rate. Indeed, the preferred frusto-conical shape discussed in the specifications is only *one possible* embodiment of the Patents-in-Suit. And following the language in the specification that the tapered portion preferably has a frusto-conical shape is the purpose of the tapered portion: when engaged with the primary platform connector, the tapered portion "distribute[s] the force from the platform member and maintain[s] the engagement of the primary platform connector . . . and the primary support connector." '401 Patent at 6:9-12. I find that the purpose of the tapered portion as set forth in the specification more persuasive than just one example of an embodiment of the patent. Therefore, I do not find it necessary for there to be a requirement that the tapered portion be continuously reducing, as Defendants suggest. Rather, the tapered portion must only gradually reduce in size such that the force applied to it from the end nearest the primary platform connector can be distributed to the wider end of the tapered portion—which can be achieved by some gradually reducing shape other than a frusto-conical shape. I will therefore construe "tapered portion" as "a gradually narrowed portion."

### C. Disposed Between[3]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| located between | located between and connected to | located between |

The parties agree that "disposed between" can be construed at least in part as "located between." *See* Brief at 27. The dispute arises as to the inclusion of the language "and connected

---

[3] This term appears in Claims 1 and 12 of the '401 Patent and Claim 1 of the '416 Patent.

to." Defendants propose including "and connected to" in the construction of "disposed between," looking primarily to the specifications of the '401 Patent. Particularly, Defendants quote two portions of the '401 Patent specification: (1) a "[t]apered portion . . . extends *from* the flange portion *to* alignment member", *see id.* at 29 (quoting '401 patent, 9:37-38) (emphasis in original); and (2) the alignment member is "positioned at one of end of the tapered portion," *see id.* (quoting '401 Patent at 9:14-21). Defendants contend that, in the context of these specifications, "[a] POSITA would understand that an element which *extends from* the flange portion is *connected to* the flange portion and that an element that *extends to* the alignment member is *connected to* the alignment member." Brief at 29 (emphasis in original).

Plaintiff opposes Defendants' proposed construction on the grounds that it is precluded by the surrounding claim language. Specifically, Plaintiff says, "Claim 1 explains that the first end comprises a 'male primary connector *having* a flange portion, a flared end, and a tapered portion.[']* It does not specify, however, that the male primary connect[or] must *only have* these features." Brief at 28 (emphasis in original). In other words, Defendants' construction would preclude infringement so long as there is any additional element other than the tapered portion between the flared end and flange portion. *Id.*

I do not find Defendants' argument for including the language "and connected to," which is based solely on a description of an embodiment of the patent, persuasive. Nothing in the claims indicates that the tapered portion must be connected to both the flange portion and the flared end;

---

The relevant language of Claim 1 of the '401 Patent is: "A portable support structure comprising: an elongate primary support configured to vertically support a platform, the  elongate primary support comprising: a first end comprising a male primary connector having a flange portion, a flared end, and a tapered portion **disposed between** the flange portion and the flared end, the flared end having an alignment channel across an end surface." '401 Patent at 14:9-17 (emphasis added).

Claim 1 of the '416 Patent contains materially similar language. *See* '416 Patent at 14:28-34.

rather, the only clear requirement is that it be located between them. I will therefore adopt

Plaintiff's proposed construction: "located between."

### D.  An Alignment Channel[4]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| a groove or furrow that allows for the positioning of parts relative to one another | a cavity arranged in a direction substantially perpendicular to a longitudinal axis of the male primary connector | a groove or furrow that allows for the positioning of parts relative to one another |

Plaintiff contends that "an alignment channel" is a straightforward term that requires no

construction beyond its plain and ordinary meaning, but to the extent a construction is necessary,

it proposes construing it as "a groove or furrow that allows for the positioning of parts relative to

one another." Brief at 30. Plaintiff looks to Merriam-Webster's definition of "channel" as "a long

gutter, groove, or furrow," and of "alignment" as "the act of aligning or state of being aligned;

especially: the proper positioning or state of adjustment of parts (as of a mechanical or electronic

device) in relation to each other." *Id.* at 30-31. Defendants oppose Plaintiff's construction, arguing

---

[4] This term appears in Claims 1 and 12 of the '401 Patent and Claim 1 of the '416 Patent.

The relevant language of Claim 1 of the '401 Patent is: "A portable support structure comprising: an elongate primary support configured to vertically support a platform, the elongate primary support comprising: a first end comprising a male primary connector having a flange portion, a flared end, and a tapered portion disposed between the flange portion and the flared end, the flared end having **an alignment channel** across an end surface," *see* '401 Patent at 14:9-17 (emphasis added); and "a platform comprising: a female primary connector comprising a connector cavity and an alignment pin across the connector cavity, the female primary connector being configured to receive the flared end and the tapered portion of the male primary connector, the female primary connector and the male primary connector being configured to connect when the elongate primary support is in a rotational orientation about the longitudinal axis that allows the **alignment channel** to engage the alignment pin during insertion of the male primary connector into the female primary connector," *see id.* at 14:22-33 (emphasis added).

Claim 12 of the '401 Patent contains materially similar language. *See* '401 Patent at 15:27-35, 15:42-16:4.

Claim 1 of the '416 Patent also contains materially similar language. *See* '416 Patent at 14:31-43.

that it "ignores the intrinsic record" and "substitutes terms that appear nowhere in the Patents-in-Suit." *Id.* at 31.

Defendants instead propose construing "an alignment channel" as "a cavity arranged in a direction substantially perpendicular to a longitudinal axis of the male primary connector." *Id.* at 30. To reach this construction, Defendants look to the '401 Patent specifications, which disclose that "[t]he alignment channel is formed as a *cavity* in the alignment member . . . [i.e., flared end], that is *arranged in a direction substantially perpendicular to a connector center axis* . . . [i.e., a longitudinal axis]" of the male primary connector. *Id.* at 31 (quoting '401 Patent at 9:27-30) (emphasis in original).

Defendants also look to the prosecution history of the '401 Patent. There, Plaintiff distinguished its proposed patent from a prior work, US Patent 4,830,144 to Werner. *See* ECF No. 78-2 ("'401 Patent Pros. Hist.") at 144, 149. In doing so, Plaintiff described its patent as allowing the male primary connector and female primary connector to "connect when the elongate primary support . . . is in a rotational orientation about its longitudinal axis that allows the alignment channel . . . to engage the alignment pin . . . <u>during</u> insertion of the male primary connector . . . into the female primary connector," *see id.* at 148 (emphasis in original), which it argued was distinguishable from the Werner patent because the Werner patent's use of a "bayonet pin" "[did] <u>not</u> include a flared end or an alignment channel across an end surface" or an alignment pin, *see id.* at 149 (emphasis in original). Defendant argues that this distinguishment means that Plaintiff "recognized that an alignment channel formed across an end surface (*i.e.*, substantially perpendicular to the longitudinal axis) required a specific rotational orientation about a longitudinal axis." Brief at 32.

Plaintiff opposes Defendants' construction, first on the grounds that it is unclear where the term "cavity" comes from, and second on the grounds that Defendants focus on the arrangement

11

of the alignment channel rather than its function. Brief at 31. In Plaintiff's eyes, nothing in the patents requires the alignment channel to be arranged perpendicular to the male primary connector to accomplish its purpose of positioning of parts relative to each other. *Id.*

I will construe "an alignment channel" as "a groove or furrow that allows for the positioning of parts relative to one another." Claim 1 of the '401 and '416 Patents makes clear that the alignment channel (1) is across an end surface of the flared end; and (2) engages the alignment pin during insertion of the male primary connector into the female primary connector when it is in a rotational orientation about the longitudinal axis allowing it to do so. For that reason, I find Plaintiff's proposal to include the language "that allows for the positioning of parts relative to one another" appropriate.

I find Defendants' proposal to construe "alignment channel" as a "cavity arranged in a direction substantially perpendicular to a longitudinal axis of the male primary connector" too narrow. Defendants' argument that Plaintiff's construction is too broad and would read on prior art falls flat when "alignment channel" is read in context of the claim. Essentially, Defendants argue that Plaintiff's definition would allow the "groove or furrow" to be the part of the male primary connector where the tapered portion meets the flared end, and that would "allow for positioning" of a retention device. *See* Brief at 32-34. But the language of Claim 1 precludes this, as it requires the alignment channel to be *across the end surface* of the flared end, and therefore would not allow for Defendants' depiction of the groove or furrow being located where the tapered portion meets the flared end, rather than at its end surface. *See* '401 Patent at 14:16-17. Additionally, Claim 1 requires that the alignment channel be able to engage with the alignment pin, which is defined as being "across the connector cavity" of the female primary connector, *see id.* at 14:24, and would therefore preclude the alignment channel from being located anywhere

other than in a position where it would engage a pin reaching from one edge of the connector cavity to another, *see* "Across and Cross," Section II.E, below.

### E. Across and Cross[5]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| extend into | extending from one side to the opposite side | extending from one point on an edge of to another point on an edge of |

Plaintiff would have the Court construe "across" and "cross" as "extend into." Brief at 35. In proposing this construction, Plaintiff relies on Merriam-Webster's definition of "across" as "so as to pass through at an angle." *Id.* Defendants oppose this proposed construction, arguing that "passing through" as provided by Merriam-Webster would mean going from one side to another, not just "extending into," which could mean "stopping in the middle of." *Id.* at 38. Such a definition would allow an embodiment such as a hole with a pin-like key, Defendants argue, which Plaintiff expressly disclaimed in patent prosecution. *Id.* (citing '401 Patent Pros. Hist. at 149).

Defendants instead would have the Court construe "across" and "cross" as "extending from one side to the opposite side," arguing that that definition is consistent with the intrinsic and

---

[5] "Across" appears in Claims 1 and 12 of the '401 Patent and Claim 1 of the '416 Patent. "Cross" appears in Claim 1 of the '416 Patent.

The relevant language of Claim 1 of the '401 Patent is: "A portable support structure comprising: an elongate primary support configured to vertically support a platform, the elongate primary support comprising: a first end comprising a male primary connector having a flange portion, a flared end, and a tapered portion disposed between the flange portion and the flared end, the flared end having an alignment channel **across** an end surface," *see* '401 Patent at 14:9-17 (emphasis added); and "a platform comprising: a female primary connector comprising a connector cavity and an alignment pin **across** the connector cavity, the female primary connector being configured to receive the flared end and the tapered portion of the male primary connector, the female primary connector and the male primary connector being configured to connect when the elongate primary support is in a rotational orientation about the longitudinal axis that allows the alignment channel to engage the alignment pin during insertion of the male primary connector into the female primary connector," *see id.* at 14:22-33 (emphasis added).

Claim 12 of the '401 Patent contains materially similar language. *See* '401 Patent at 15:27-35, 15:42-16:4.

Claim 1 of the '416 Patent also contains materially similar language. *See* '416 Patent at 14:31-43.

extrinsic evidence and would be a POSITA's understanding of the word. *Id.* at 37-38. Plaintiff's issue with this construction is that in the embodiment depicted by the figures in the '401 Patent, the end surface is circular, and therefore does not technically have "sides," so Defendants' use of the word "sides" would exclude the preferred embodiment. *Id.* at 39. Defendants oppose this argument on the basis that a POSITA would understand that a physical object would necessarily have a "side" in order to exist in a three-dimensional space, even if a circle doesn't technically have "sides." *Id.* at 40.

I disagree with Defendants' argument that an alignment channel that stops in the middle of the end surface rather than going from one side of it to another side of it would include a post with a hole for a pin-like key because, read in the context of Claim 1, the alignment channel is *on* the *end surface*. *See* '401 Patent at 14:16-17 ("the flared end having an alignment channel across an end surface"). This is different from a hole bored in a post, which would not be considered as located *on a surface of* the flared end but instead *through* the flared end. That being said, I do not agree with Plaintiff's construction of "extend into," because "extend into" is not sufficient to describe the plain and ordinary meaning of "across" or "cross." By way of example, if one said they walked across the street, they wouldn't mean that they walked into the middle of the street and stopped.

As for Plaintiff's argument that circles do not have sides, I agree with Defendants that a POSITA would likely understand what "across" means in the context of a circle. But for the sake of geometrical accuracy, I will replace "side" with a point on an edge and construe "across" as "extending from one point on an edge of another point on an edge of."

### F. A Hook[6]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| a mechanism for catching or holding in place | a curved portion having a radius of curvature forcing a change in rotational orientation of a secondary support member when directed over the curved portion | a mechanism for catching or holding in place |

---

[6] This term appears in Claims 1, 5-7, 10-12, and 19 of the '401 Patent.

The relevant language of Claim 1 is: "A portable support structure comprising: . . . **a hook** projecting from a location between the first end and the second end." '401 Patent at 14:9, 14:20-21 (emphasis added).

In Claim 5: "The portable support structure according to claim 1, wherein the second connecting end comprises an aperture, the aperture being configured to engage the **hook**." *Id.* at 14:56-58 (emphasis added).

In Claim 6: "The portable support structure according to claim 5, the hook being arranged and disposed such that, upon rotational orientation of the elongate primary support and subsequent connection of the elongate primary support to the platform, the **hook** is correspondingly positioned to enable a user to readily connect the elongate secondary support to the platform and to the elongate primary support by engaging the first connecting end and the secondary connector and by engaging the second connecting end and the **hook**." *Id.* at 14:59-67 (emphasis added).

In Claim 7: "The portable support structure according to claim 1, the **hook** further comprising a curved portion that projects substantially toward the first end." *Id.* at 15:1-3 (emphasis added).

In Claim 10: "The portable support structure according to claim 1, the **hook** being arranged and disposed such that, upon rotational orientation of the elongate primary support and subsequent connection of the elongate primary support to the platform, the **hook** is correspondingly positioned to enable a user to readily connect the elongate secondary support to the platform and to the elongate primary support by engaging the first connecting end and the secondary connector and by lockingly engaging the second connecting end and the **hook**." *Id.* at 15:12-20 (emphasis added).

In Claim 11: "The portable support structure according to claim 10, wherein the first connecting end and the second connecting end have similar geometries, enabling the first connecting end to alternatively lockingly engage the **hook** and enabling the second connecting end to alternatively engage the secondary connector." *Id.* at 15:21-26 (emphasis added).

In Claim 12: "A portable support structure comprising: . . . a hook member comprising a **hook**, the hook member being releasably securable to the elongate primary support at a location between the first end and the second end." *Id.* at 15:27, 15:38-41 (emphasis added).

In Claim 19: "The portable support structure according to claim 12, wherein the first connecting end comprises a first aperture, wherein the second connecting end comprises a second aperture, and wherein the first connecting end and the second connecting end have similar geometries, enabling the first connecting end to alternatively lockingly engage the **hook** and enabling the second connecting end to alternatively engage the secondary connector." *Id.* at 16:37-41 (emphasis added).

15

Plaintiff proposes construing "hook" as "a mechanism for catching or holding in place," arguing that it is "consistent with the plain and ordinary meaning of 'hook,' particularly in the context of the surrounding claim language and Specification," as "the 'hook' catches and holds the secondary support in place." Brief at 41. Plaintiff additionally points to the '401 Patent prosecution history in which the patent examiner identified certain straight projections from a prior art as "hook members." *Id.* at 46.

Defendants oppose Plaintiff's construction on the grounds that it would read on structures that are clearly not a hook and that were disclaimed by Plaintiff during prosecution of the '401 patent. *Id.* at 42-44. Specifically, Defendants point to the examiner's rejection of Claim 1 during prosecution because prior art disclosed a stud with a gravity-operated latch, which the examiner found was equivalent to the "hook portion." *Id.* at 44. In response to the examiner's rejection, Plaintiff had argued that the "hook portion" was different from the stud with a gravity-operated latch because that prior art "did not disclose the rotation . . . as shown" in Plaintiff's application. *Id.* (quoting '401 Patent Pros. History at 120). Thus, Defendants say, allowing Plaintiff's construction of "a mechanism for catching or holding in place" would encompass this prior art of a stud with a gravity-operated latch, which Plaintiff previously explicitly disclaimed. *Id.* In reply to this argument, Plaintiff points out that its response to the examiner about the prior art's failure to disclose rotation was in response to the examiner's rejection of Claim 10, not Claim 1, and its argument there was that the prior art did not disclose the specific geometry of the hook portion that requires rotation of the secondary support member. *Id.* at 45-46.

Defendants propose construing "hook" as "a curved portion having a radius of curvature forcing a change in rotational orientation of a secondary support member when directed over the curved portion." *Id.* at 40. Defendants argue that this construction "utilizes the language found in the specification to apply the proper scope of 'a hook' as understood by a POSITA (any by TAIT

16

during prosecution)." *Id.* at 43. Specifically, Defendants say, the term "hook" is not used in standing alone in the specifications in the Patents-in-Suit, but rather within the phrase "hook portion." *Id.* And the "hook portions" as described in the specifications include a curved portion over which the secondary support connector rotates, supporting Defendants' proposal to define "a hook" as "a curved portion having a radius of curvature forcing a change in rotational orientation of a secondary support member when directed over the curved portion." *Id.*

Plaintiff opposes Defendants' construction, arguing that it is improperly lifted from the specification, which states that "[t]he hook portions include a curved portion that has a radius of curvature that allows a secondary support connector of a secondary support member to be directed over the hook portion." *Id.*at 41-42. Plaintiff believes that "hook portion" as used in the specification must be different than just a "hook" as claimed, because "if the inventor used different terms to identify similar claim limitations, those terms should have different meanings." *Id.* at 42. In reply, Defendants say that the term "hook" is never used standing alone in the specification—it is used either in conjunction with "member" or "portion" throughout. Because the specification describes hook portions engaging with the secondary end of the secondary support, Defendants say, a POSITA would understand that the claimed "hook" is referring to "hook portion." *Id.* at 43.

Plaintiff also looks to Claim 7, which claims "[t]he portable support structure according to [C]laim 1, the hook further comprising a curved portion that projects substantially toward the first end." *Id.* at 42 (alteration in original). Relying on the doctrine of claim differentiation, Plaintiff proposes that Claim 7 can only narrow Claim 1 "if the 'hook' described in Claim 1 does not necessarily contain a 'curved portion'"—otherwise, Claim 7 would be rendered meaningless. *Id.* Defendants oppose this argument, contending that when reading Claim 1, a POSITA would understand a hook to contain a curved portion that projects in any direction, and Claim 7

17

differentiates Claim 1 in that it requires the hook to project "substantially towards the first end." *Id.* 44.

The parties' arguments seem to boil down to whether there should be some requirement that the hook be definitionally curved. Defendants briefly refer in their argument to the '401 Patent specifications' description of "locking engagement" that might result from the secondary support connector being directed over the hook portion. *Id.* at 43. Specifically, the specification discloses that "[t]he hook portions . . . include a curved portion . . . that has a radius of curvature that allows a secondary support connector . . . of a secondary support member . . . to be directed over the hook portion . . . . When the secondary support connector . . . is in position and in engagement with the engagement surface . . . , the curved portion . . . locks the secondary support connector . . .. in place and prevents disengagement, thereby retaining the secondary support member . . . in locking engagement. Locking engagement refers to the requirement that a change in angular orientation must occur between the secondary support connector . . . and the hook portion . . . to effect separation therefrom." '401 Patent at 8:32-35, 8:39-43, 8:58-61. [7] Locking engagement is different from detachable engagement, which is "the ability to disconnect support members without having to first change the orientation between the support." *Id.* at 4:9-13.

Defendants rely on this use of "locking engagement" in the '401 Patent specifications to support its argument that the hook must be curved. However, Defendants do not acknowledge the fact that "locking engagement" is not used in the portion of Claim 1 that described the engagement

---

[7] A similar definition of "locking engagement" was set out in prosecution of the '401 Patent. There, Plaintiff stated that "[t]he phrase 'lockingly engage' is intended to reflect the verb form of the phrase 'locking engagement,' as defined in paragraph [0044] of the Application. In other words, 'lockingly engage,' . . . means that the second connecting end engages the hook in such a manner that a change in angular orientation must occur between the elongate secondary support and the hook to subsequently disengage the second connecting end and the hook. This . . . . limitation is not disclosed in Werner. As evidenced by FIG. 5 of the Werner patent, when gravity operated latch 42 is actuated, a user can simply remove guard rail 18 from guard rail stud 40 without changing angular orientation." '401 Patent Pros. Hist. at 154.

of the elongate primary support with the hook. *See* '401 Patent at 14:40-42 ("the second connecting end being configured to engage the hook of the elongate primary support"). This is significant because "locking engagement" *is* used in describing the engagement of the elongate primary support with the hook in Claim 12. *See id.* at 16:11-13 ("the second connecting end being configured to lockingly engage the hook"). Pursuant to the doctrine of claim differentiation, "locking engagement" as described in Claim 12—requiring a change in angular orientation over the hook—must mean something else other than plain "engagement" as set forth in Claim 1. Because "locking engagement" is not used to describe the engagement between the hook and the secondary support member in Claim 1, I find that similarly, no change in angular orientation is required, as Defendants propose. Rather, all that is required is for the hook to be "a mechanism for catching or holding in place."

**G. The Female Primary Connector And The Male Primary Connector Being Configured To Connect When The Elongate Primary Support Is In A Rotational Orientation About The Longitudinal Axis That Allows The Alignment Channel To Engage The Alignment Pin During Insertion Of The Male Primary Connector Into The Female Primary Connector[8]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| the female primary connector and the male primary connector being able to connect when the elongate primary support is rotated about its longitudinal axis relative to the female and male primary connectors so that the alignment channel may engage the alignment pin while the male primary connector is inserted into the female platform connector | the female primary connector and the male primary connector being configured to connect when the elongate primary support is in a specific rotational position about the longitudinal axis such that a horizontal axis of the alignment channel is parallel to a horizontal axis of the alignment pin to allow insertion of the alignment pin into the alignment channel simultaneous with and in the direction of movement of the male primary connector into the female primary connector | the female primary connector and the male primary connector being able to connect when the elongate primary support is in one of one or more specific rotational orientations about its longitudinal axis that allows the [groove or furrow that allows for the positioning of parts relative to one another] to engage the alignment pin simultaneously with the male primary connector becoming fully inserted into the female platform connector |

I begin discussion of this claim by noting that it includes the phrase "alignment channel," I have already construed as "groove or furrow that allows for the positioning of parts relative to one another." *See* Section II.B, *supra*. I will therefore replace any use of "alignment channel" with "groove or furrow that allows for the positioning of parts relative to one another" throughout.

Plaintiff proposes construing "the female primary connector and the male primary connector being configured to connect when the elongate primary support is in a rotational orientation about the longitudinal axis that allows the [groove or furrow that allows for the positioning of parts relative to one another] to engage the alignment pin during insertion of the

---

[8] This term appears in Claims 1 and 12 of the '401 Patent.

male primary connector" as "[t]he female primary connector and the male primary connector being able to connect when the elongate primary support is rotated about its longitudinal axis relative to the female and male primary connectors so that the [groove or furrow that allows for the positioning of parts relative to one another] may engage the alignment pin while the male primary connector is inserted into the female platform connector." Brief at 48. Plaintiff argues that the phrase does not require construction, but if the Court considers it necessary, its proposed construction is the best way to aid the jury in its understanding. *Id.*

Defendants, on the other hand, propose the construction "the female primary connector and the male primary connector being configured to connect when the elongate primary support is in a specific rotational position about the longitudinal axis such that a horizontal axis of the [groove or furrow that allows for the positioning of parts relative to one another] is parallel to a horizontal axis of the alignment pin to allow insertion of the alignment pin into the [groove or furrow that allows for the positioning of parts relative to one another] simultaneous with and in the direction of movement of the male primary connector into the female primary connector." *Id.* at 48.

Plaintiff first takes issue with Defendants' use of "rotational position," arguing that "rotational orientation" must refer to the rotational position of the primary support *relative to* the male and female primary connectors, as indicated by the Merriam Webster definition of orient— "to set or arrange in any determinate position especially in relation to the points of the compass." *Id.* at 48-49. Plaintiff also takes issue with the word "specific" modifying "rotational position," as nothing in the plain and ordinary meaning of the claim language suggests a "specific" rotational position or orientation. *Id.* at 50. In response, Defendants argue that its construction recognizes the purpose of the elongate support being in a specific rotational position about its longitudinal axis so as to allow the alignment channel to engage the alignment pin. *Id.* at 52. In support of this, they point to the Summary of the Invention, which notes that the alignment channel engages the

21

alignment pin and retains the primary support connector in a fixed rotational position, which thus requires a specific rotational position of the elongate support. *Id.* (citing '401 Patent at 1:51-53, 9:23-26).

As for the  phrase "insertion of the alignment pin into the alignment channel simultaneous with and in the direction of movement of the male primary connector into the female primary connector," Plaintiff argues that Defendants' construction excludes the preferred embodiment, as the alignment channel does not engage the alignment pin simultaneously with the movement of the male primary connector into the female primary connector, but only at the end of insertion. *Id.* at 50-51. Additionally, Plaintiff says, the alignment pin cannot move in the same direction of movement as the male primary connector, as those two must move toward each other in order to engage. *Id.* Defendants respond, looking to the '401 Patent prosecution history, in which Plaintiff clarified that the alignment channel must engage the alignment pin during insertion, as opposed to after insertion, in order to distinguish it from a prior art that included a key inserted after the male primary support member was inserted into the female primary support member. *Id.* at 53 (citing '401 Patent Pros. Hist. at 53).

I will construe this phrase as "the female primary connector and the male primary connector being able to connect when the elongate primary support is in one of one or more specific rotational orientations about its longitudinal axis that allows the [groove or furrow that allows for the positioning of parts relative to one another] to engage the alignment pin simultaneously with the male primary connector becoming fully inserted into the female platform connector." I agree with Defendants that, in order for a rotational orientation to be achieved, the elongate primary support must be in a specific rotational position. However, so as to not preclude the possibility that more than one specific rotational position will suffice, the language "one or more specific rotational positions" is necessary.

I also agree with Defendants' argument that there needs to be a distinction between engagement during insertion and engagement after insertion. However, it cannot be said that the alignment pin engages with the alignment channel during the entire insertion process. Rather, engagement happens at the end of insertion. I will therefore construe "engage the alignment pin during insertion of the male primary connector into the female primary connector" as "engage the alignment pin simultaneously with the male primary connector becoming fully inserted into the female platform connector."

I agree with Plaintiff that Defendants' proposal about the direction of movement is at best unclear. If the alignment pin moved in the same direction as the male primary connector, there would be no engagement between the two parts. I will therefore decline to include Defendants' proposed language "in the direction of movement of the male primary connector."

**H.  To Detachably Engage The Male Support Connector Only When The Male Support Connector Is Rotationally Oriented Such That The Alignment Channel Is Engaged By The Alignment Pin[9]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
| --- | --- | --- |
| the female platform connector is configured to detachably engage only the male support connector when the male support connector is rotationally oriented to permit engagement of the alignment channel by the alignment pin | to detachably engage the male support connector only when the male support connector is in a specific rotational position about the longitudinal axis such that the alignment pin is inserted into the alignment channel in the direction of movement of the male support connector | to detachably engage the male support connector only when the male support connector is in one of one or more specific rotational positions about its longitudinal axis such that the [groove or furrow that allows for the positioning of parts relative to one another] is engaged by the alignment pin |

Plaintiff proposes the following construction: "the female platform connector is configured to detachably engage only the male support connector when the male support connector is rotationally oriented to permit engagement of the alignment channel by the alignment pin." Brief at 54. Plaintiff argues that no construction is necessary once the court construes "alignment channel," but otherwise offers this construction as clarification that the female platform connector is configured to detachably engage only the male support connector. *Id.* at 55. Defendants take

---

[9] This term appears in Claim 1 of the '416 Patent, which reads as follows:

"A connector system for connecting components of a support structure in proper orientation, the connector system comprising:

a male support connector having a flange portion, a flared end, and a tapered portion disposed between the flange portion and the flared end, the flared end having an alignment channel cross an end surface; and

a female platform connector having a tapered connector cavity and an alignment pin across the tapered connector cavity, the female platform connector being configured to receive the flared end and the tapered connector cavity being configured to receive the tapered portion of the male support connector and **to detachably engage the male support connector only when the male support connector is rotationally oriented such that the alignment channel is engaged by the alignment pin**." '416 Patent at 14:28-43 (emphasis added).

particular issue with the fact that Plaintiff inexplicably moved the location of the word "only," which changes the meaning of the claim. *Id.* at 56.

Defendants propose construing the phrase as "to detachably engage the male support connector only when the male support connector is in a specific rotational position about the longitudinal axis such that the alignment pin is inserted into the alignment channel in the direction of movement of the male support connector." *Id.* at 55. The parties make similar arguments as in the preceding disputed claim as to narrowing "rotational orientation" to "specific rotational position," defining "engaged" as "inserted," and the direction of movement of the alignment pin relative to the movement of the male support connector. *Id.* at 55-57.

I will construe the phrase as "to detachably engage the male support connector only when the male support connector is in one of one or more specific rotational positions about its longitudinal axis such that the [groove or furrow that allows for the positioning of parts relative to one another] is engaged by the alignment pin." I apply my reasoning above in using the language "one of one or more specific rotational positions about its longitudinal axis" and rejecting Defendants' proposal to use the language "in the direction of movement of the male support connector." As for the word "only," I find it appropriate to keep it where it appears in the claim language so as to not change the claim's meaning as written.

## I. Preamble to '876 Patent[10]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| assembly instructions on how to put together and take part a portable support structure | Limiting | A method of assembling and disassembling a portable support structure |

---

[10] The preamble of Claim 1 of the '876 Patent states: "A method of assembling a portable support structure." *See* ECF No. 47-3 ("'876 Patent") at 14:20-21.

The parties agree that the Preamble to the '876 patent is limiting, but they disagree as to whether the Patent should be construed as including instructions to both assemble *and disassemble* the portable staging structure.  Brief at 57.

In Plaintiff's view, the preamble should be construed such that the '876 Patent claims instructions on how to put together and take apart the portable structure, arguing that such a construction would be obvious to both a lay person and a POSITA. *Id.*  Additionally, Plaintiff says, in context of the surrounding claim language, Claim 1 makes clear that the method of assembly also includes disassembly. *Id.* at 58. Further, there are multiple references to disassembly of the portable support structure throughout the '876 Patent, including: "Portable structures, such as stages or platforms, must be capable of breaking down into relatively small units that can be loaded onto trucks or airplanes for transport . . . . What is needed is a portable platform that is easily assembled and disassembled with little or no technical skill," Brief at 58 (quoting '876 Patent at 1:28-33); "One advantage of the present invention is that support structures, such as stages or platforms may be assembled and disassembled repeatedly," *id.* (quoting '876 Patent at 2:4-8); and "A further advantage of the present is that the portable support structure occupies less space when disassembled than stages previously known in the art," *id.* (quoting '876 Patent at 2:35-37).

In opposition, Defendants argue that if Plaintiff is correct that it is obvious to a POSITA that the preamble includes disassembly, then no construction should be necessary. *Id.* at 58-59. On the other hand, Defendants say, Plaintiff's argument that assembly instructions must include disassembly instructions "lacks a basis in both the intrinsic record and reality." *Id.* at 59. A POSITA being provided with a method of assembly would assume they are *only* assembling. *Id.* at 60. In support of this, Defendants point to IKEA assembly instructions, which include instructions for assembling, but not disassembling. *Id.*

26

Finally, Defendants argue that TAIT's proposed construction would render the claim invalid under 35 U.S.C. § 101, as "[i]nstructions recited in a claim are abstract ideas, and therefore unpatentable." *Id.* In response, Plaintiff suggests that if the Court believes the use of the word "instructions" would invalidate the claim, it should replace "instructions" with "method for." *Id.* at 61. I will accept Plaintiff's suggestion, as the Preamble itself uses the language "a method of." To the extent the Court should construe the claim to preserve its validity, as Defendants argue, that maxim is limited "to cases in which 'the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous.'" *Phillips*, 415 F.3d at 1327 (internal citation omitted). I do not find "a method of" to be ambiguous to the point of analyzing it for validity at this stage.

What I find most persuasive in determining whether the Preamble includes a method of disassembling is the fact that Claim 1 discloses "disassembling the support structure by releasing the first support member by a manual force," '876 Patent at 14:32-33, and Claim 5 discloses "[t]he method of claim 1, further comprising disassembling the support structure into smaller components suitable for storage or transportation." *Id.* at 14:43-45. It would not make sense to call the '876 Patent a method only of assembly when disassembly itself is included as a step in Claim 1 and is further refined in Claim 5.

Defendants argue that as originally filed, the '876 Patent did not include disassembly. *Id.* at 59. I find this unpersuasive, because the Patent *does* include disassembly now. As for Defendants' comparison to IKEA, I find it similarly unpersuasive because in most instances, furniture is not meant to be repeatedly assembled and disassembled, unlike a portable stage, whose key word "portable" implies that it will be taken apart and moved from place to place.

### J.  Standing Position[11]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| positioned so that one's feet are the only points of contact with the ground | position in which body is upright, legs are straight, and weight is supported by feet | position in which one is on their feet |

Plaintiff argues that "standing position" does not require construction, but to the extent the Court finds construction necessary, it would have the Court construe "standing position" as "positioned so that one's feet are the only points of contact with the ground." Brief at 62. Plaintiff contends that this construction "makes clear that standing means standing on one's feet and does not include laying, sitting, or kneeling." *Id.* Defendants argue that Plaintiff's construction "encompasses positions that are clearly not a standing position, such as squatting, lunging, and multiple yoga poses." *Id.*

Defendants would instead have the Court construe "standing position" as "position in which body is upright, legs are straight, and weight is supported by feet." *Id.* Defendants contend this construction is supported by extrinsic evidence, looking to the definition of standing that would have been applied by a POSITA at the time—"to take or maintain an upright position on the feet." *Id.* at 63 (citing *stand*, Webster's II New College Dictionary (2001)).

Plaintiff's issue with Defendants' construction is that it limits standing to requiring one's legs to be straight, which is sometimes hazardous in manual labor situations, and some bend to the

---

[11] This term appears in Claims 1 and 4 of the '876 Patent.

The specific language in Claim 1 is: "A method of assembling a portable support structure, comprising: positioning a first platform member, wherein an assembler is in a **standing position**; then . . . securing a second platform member to the first platform member to form a continuous platform surface, wherein the assembler remains in a **standing position** during the step of securing." '876 Patent at 14:20-33 (emphasis added).

In Claim 4: "The method of claim 1, further comprising positioning and securing a secondary support member to the first support member while the assembler remains in a **standing position**." *Id.* at 14:43-45.

leg is necessary. *Id.* at 62. Defendants submit that this argument is unsupported, as a goal of the '876 patented invention is to "reduc[e] back-related injuries caused by repetitive tasks," *id.* at 63 (quoting '876 Patent at 11:59-60), and Plaintiff's construction would allow for positions conducive to back injuries if used during assembly, such as yoga poses.

I will construe "standing position" as a "position in which one is on their feet." Defendants' proposal to require that the legs are straight is too narrow and unworkable. I find "position in which one is on their feet," within the context of the surrounding claim language describing a method of assembling and disassembling a portable stage structure, to sufficiently define what it means to be "standing." I do not believe a POSITA would take "standing" to mean being in one of various obscure yoga poses, as Defendants suggest, so no further narrowing of the definition is required.

### K. Then[12]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
| --- | --- | --- |
| followed by | followed next by | followed by |

Plaintiff would have the Court construe "then" as it appears in the '876 Patent as "followed by." Brief at 64. As an initial matter, Plaintiff says this word does not need construction, as it is a word jurors use likely several times a day. *Id.*

Defendants would have the Court construe "then" as "followed next by," looking to the context of the claim, which would require steps without intervening actions. *Id.* at 65. Defendants note that Plaintiff amended Claim 1 to include the word "then" during prosecution of the '876

---

[12] This term appears in Claim 1 of the '876 Patent: "A method of assembling a portable support structure, comprising: positioning a first platform member, wherein an assembler is in a standing position; **then** securing a first support member to the first platform member; **then** securing another first support member to the first platform member; **then** securing a second platform member to the first platform member to form a continuous platform surface, wherein the assembler remains in a standing position during the step of securing; and disassembling the support structure by releasing the first support member by a manual force" '876 Patent at 14:20-33 (emphasis added).

Patent, and it chose to omit the word "then" before the disassembly step, "indicating that the inclusion of the term 'then' is different from the omission of the term 'then.'" *Id.* at 66. Defendants additionally cite the Webster's II New College Dictionary definition of "then" from 2001, which is "next in time, space, or order; immediately afterward." Brief at 66. *Id.*

Plaintiff opposes Defendants' proposed construction on the grounds that it is contrary to the plain and ordinary meaning of "then" and would allow a method for construction to evade infringement so long as the assembler took any action in between steps prescribed in the patent. *Id.* at 64.

I will construe "then" according to Plaintiff's proposal. What I find most convincing is the parties' joint technology tutorial, which included a video exhibit showing assembly pursuant to the '876 patent and an accompanying narrative. *See* ECF No. 82. According to the narrative, in relevant part, "[t]he first platform member and four primary support members are removed from carts. Four primary support members are inserted into the first platform member. A second platform member is removed from a cart. The second platform member is brought into contact with the first platform member." *See* ECF No. 82-4.

If I were to accept Defendants' construction of "then" as "followed next by," it would preclude the very demonstration shown in the parties' joint technology tutorial. The '876 patent claims "positioning a first platform member, wherein an assembler is in a standing position; then securing a first support member to the first platform member; then securing another first support member to the first platform member; then securing a second platform member to the first platform member to form a continuous platform surface, wherein the assembler remains in a standing position during the step of securing." '876 Patent at 14:22-32. If "then" meant "followed next by," then the platform could never be initially set up with four primary support members, as demonstrated by the joint technology tutorial. Defendants conceded this at the claim construction

30

hearing but maintained their argument that the use of the word "then" in the Patent is unconventional and a deliberate choice that must mean "followed next by." I cannot agree with that definition in the context of the claim and the joint technology tutorial.

### L.  Continuous Platform Surface[13]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| the surfaces of the first and second platform members being in the same plane | a solid unbroken surface capable of holding a large amount of weight | a surface formed by platform members abutted in the same plane |

Plaintiff would have the Court construe "continuous platform surface" as "the surfaces of the first and second platform members being in the same plane." *Id.* at 67. Plaintiff argues that its construction "clarifies that securing the two platform members results in a single flat surface or plane." *Id.* Defendants contend that Plaintiff's definition is so broad that it disregards logic and would allow, for example, two surfaces separated by a gap to be considered "continuous" so long as they are placed at the same elevation. *Id.* at 70.

Defendants would have the Court construe "continuous platform surface" as "a solid unbroken surface capable of holding a large amount of weight." *Id.* at 67. Defendants say that their construction is consistent with the plain language of the claim and extrinsic evidence, as a POSITA would understand continuous to mean "uninterrupted" or "unbroken." *Id.* at 69 (quoting *continuous*, Webster's II New College Dictionary (2001)). Plaintiff replies that there is no necessity to construe this claim as requiring the platforms to physically touch, "as this is presupposed by the fact that the surface is formed by 'securing' the platforms together." *Id.* at 67.

---

[13] This term appears in Claim 1 of the '876 Patent: "A method of assembling a portable support structure, comprising: positioning a first platform member, wherein an assembler is in a standing position; then securing a first support member to the first platform member; then securing another first support member to the first platform member; then securing a second platform member to the first platform member to form **a continuous platform surface**, wherein the assembler remains in a standing position during the step of securing; and disassembling the support structure by releasing the first support member by a manual force" '876 Patent at 14:20-33 (emphasis added).

Plaintiff also argues that Defendants' proposed construction is a physical impossibility, as the two separate platforms will always have a groove between them and cannot be technically "unbroken." *Id.* Plaintiff finally opposes Defendants' proposed requirement that the platform be able to "hold[] a large amount of weight," as such a requirement is not consistent with the plain and ordinary meaning of "platform" and is otherwise vague and subjective. *Id.* at 68.

I will construe "continuous platform surface" as "a surface formed by platform members abutted in the same plane." Looking at the context of the claim, it is clear that there is meant to be some virtually unbroken surface formed by the platforms. Plaintiff's construction is too broad in that sense, as it would allow the platforms to be in the same plane but not necessarily next to each other. But Plaintiff's point that Defendants' construction is impossible because a groove between the platforms keeps them from being completely unbroken is well taken. For that reason, I will use the word "abut," which, at the time of patent prosecution, was defined as "to border on" or "to touch at one end or side of something." *See abut*, Webster's II New College Dictionary (2001). I do not find Defendants' language about the capability of supporting a large amount of weight necessary for the purposes of the meaning of a continuous platform surface and decline to use it in construing this claim.

III.    **CONCLUSION**

For the foregoing reasons, I adopt the above-described claim constructions. An appropriate order follows.

32